CARROLL D. BESADNY, Secretary Department of Natural Resources
You have requested my opinion as to whether tax-exempt entities such as municipalities and non-profit organizations may enter or continue lands under the forest tax programs of chapter 77, Stats. In my opinion, public tax-exempt entities such as municipalities may neither enter nor continue their lands in the forest tax programs of chapter 77, but private entities whose property would otherwise normally be tax-exempt under chapter 70, may participate in such programs.
Chapter 77 comprises, among other things, three tax programs designed to foster sound forestry programs in Wisconsin. These programs, the Forest Cropland Law (sections 77.01 to 77.15), the Woodland Tax Law (section 77.16) and the Managed Forest Land Law (subchapter VI of chapter 77), are all administered by the Department of Natural Resources (the Department). As of July 20, 1985, however, lands may be entered only under the Managed Forest Land Law. The other two programs, though being phased out, nonetheless must be examined because they still apply to a significant amount of forest acreage already entered under them. Furthermore, a discussion of the Forest Cropland Law in particular helps to construct a historical framework for the law's original and continuing intent.
The Forest Cropland Law, the first of the three programs, was enacted in 1927 in response to the rampant tax delinquency and wholesale land abandonment plaguing Wisconsin's northern counties, a direct result of overly-aggressive timber harvesting and a series of devastating forest fires.[1] What only a generation earlier *Page 281 
had been vast stretches of virgin timber was by the 1920'S a cutover, burned-over virtually nonproductive wasteland.[2]
The Forest Cropland Law was to serve a dual purpose.[3]
First, it sought to restore damaged, unmarketable lands to productivity through sound forestry practices. The second aim was to equitably tax private lands while providing some measure of financial assistance to the financially-pressed counties and towns.
In general, the Forest Cropland Law provides that lands accepted by the Department are essentially exempted from the general property tax. In lieu thereof, such lands are subject to an annual tax, or "acreage share," payable to the town wherein the forest crop lies, and to a severance tax of ten percent of the stumpage value payable to the state when timber is cut or, if no cutting is done, at the end of the contract period. This arrangement is a contract between the state and the landowner which runs with the land for either twenty-five or fifty years.
This alternative tax scheme represents a tax burden to the owner less than that otherwise borne under the usual property tax laws. In exchange for such special tax treatment, the owner agrees to hold the land "permanently for the growing of timber under sound forestry practices, rather than for . . . other purposes." Sec. 77.02(3), Stats. Should the landowner elect to withdraw from the program, or should the department find the owner not to be in full compliance with the program's requirements, the withdrawal procedure laid out in section 77.10
is to be followed. Not surprisingly, this takes the form of a tax penalty measured in a manner similar to the general property tax imposed under chapter 70, so as to discourage intemperate withdrawals and misuse of the program.
The Woodland Tax Law, enacted in 1949, is similar in concept and purpose to the Forest Cropland Law. It differs, however, in that the Woodland Tax Law applies to smaller land parcels on fifteen-year contracts. There are some further differences in acreage shares, department administration and withdrawal penalties. Additionally, no severance tax is required. Finally, in contrast to the Forest Cropland Law which requires the town treasurer to pay twenty percent of amounts received under the program to the *Page 282 
county treasurer, all woodland tax revenues are retained by the town or city treasurer.
The Managed Forest Land Law was enacted by 1985 Wisconsin Act 29 to provide for the management of private forest lands in a single comprehensive program. As existing contracts under either the forest cropland or woodland tax programs expire, owners may petition the department to designate their land as managed forest land. The legislative reference library drafting file reveals that this law was meant to address a variety of concerns regarding inadequate tax rates, public use of such lands and the desire for stricter eligibility and management requirements.
As with the other programs, the Managed Forest Land Law provides an alternative, reduced tax scheme, yield tax and withdrawal penalties calculated in part like general property taxes. The revenues received for acreage shares, yield taxes and withdrawal taxes are distributed among the department, the county and the municipality in a similar fashion to that provided for by both of the other programs.
You state that, based upon statutory provisions and prior opinions of this office, "it appears clear that a county or the State of Wisconsin may not enter or continue lands under these forest tax programs." You further note that the department has also considered the forestry programs, and the tax benefits and the burdens attached to participation in such forestry contracts to be inapplicable to tax-exempt entities such as municipalities and non-profit organizations. Apparently these interpretations have been questioned, and you therefore seek my opinion.
Unfortunately, who can be an "owner" eligible to participate within the parameters of the forest tax programs set forth in chapter 77 is not immediately apparent on the face of the statutes. "Owner" is not defined anywhere in the chapter, nor does the definition found in Wisconsin Administrative Code section NR 46.15(23)[4] provide unambiguous direction. However, where one of several interpretations of a statute is possible, we must "ascertain the legislative intention from the language of the statute in relation to its scope, history, context, subject matter and object intended to *Page 283 
be accomplished." Heaton v. Independent Mortuary Corp., 97 Wis.2d 379,394, 294 N.W.2d 15 (1980).
Though the statutes only describe who may participate in these programs in general terms, an examination of the subject matter and language of the statutes in the context of the historical events surrounding their enactment leads me to conclude that neither the state nor the county may enter or continue its lands under any of the forest programs. The reasons that each may not participate in such programs differ. The statutes are inapplicable to the state because, under basic contract principles, it cannot enter into a contractual relationship with itself. See 66 Op. Att'y Gen. 78 (1977). The county's ineligibility rests more directly on statutory grounds. Though early in the legislative history of the Forest Cropland Law it specifically authorized the entry of county acreage, see
chapter 343, Laws of 1929, such participation has since been expressly terminated. See ch. 345, sec. 13, Laws of 1963. Administration of county forests is now entirely separate from chapter 77 and is governed by sections 28.10 and 28.11. The reason for the change was to achieve a more permanent program of management and development of forest products by the counties. Sec. 28.11, Stats.
An examination of the treatment of counties throughout the history of these programs is important because it helps to illustrate why I believe that other municipalities also never were intended to be participants in such programs.
Prior to 1927, counties were not expressly authorized to engage in forestry. They, therefore, found themselves in an extremely precarious financial position: tax-delinquency of cut-over land was widespread, but if such lands reverted to the counties by tax deed, the passing of the land from private to public ownership simply eroded the tax base and added to the store of unsaleable county property which generated no tax revenue. The only way to rehabilitate the over-harvested and fire-ravaged northern counties was through a long-term program providing for an increase in revenues of local government, effective fire control and the restoration of millions of acres of publicly owned tax deeded forest lands and private forest lands to productive use. Thus, the same Legislature that enacted the Forest Crop Law in 1927 empowered the counties, through then section 59.98 (now sections 28.10 and 28.11), the County Forest Reserve Law, to remove tax-delinquent lands from *Page 284 
the assessment rolls by taking tax deed to those lands, designating them as county forests and providing for expenditure of public funds for their management. Chs. 57 and 454, Laws of 1927.
In 1929, an amendment to the Forest Crop Law was enacted expressly authorizing counties to enter land under that program. Throughout the next three decades, several other amendments expressly directed at counties operated to make the Forest Cropland Law as attractive as possible to them. Therefore, given the repeated, unambiguous and solitary statutory inclusion of "counties" as an active participant in the forestry programs, together with the inclusion of the various other governmental entities only in the statutorily-defined tax distribution plan, the original placement of the County Reserve Forest Law in chapter 59 (counties) and its ultimate separate placement in sections 28.10 and 28.11, the exclusion of "all county lands" from participation under chapter 77, in 1963 (section28.11(4)(b)), and the unmistakably separate treatment of community forests of cities, villages, towns and school districts (section 28.20), it is plain to me that the Legislature meant counties to be the only governmental entity to be included.Expressio unius est exclusio alterius. Moreover, the reference to counties cannot be viewed as a euphemism for "the state." See 46 Op. Att'y Gen. 16 (1957). Undoubtedly, it was the large holdings by counties of tax delinquent lands qualifying for the type of forest restoration contemplated by the Legislature, as well as the county's central role in the distribution of taxes, which insured that counties would play a unique governmental role in solving the problems which the Forest Cropland Law and its successors were designed to solve.
If the Legislature had been at all inclined to include other municipalities as potential participants in either the Forest Cropland or Woodland Tax Laws, the numerous amendments thereto provided ample legislative opportunity. The Legislature did not so provide. Moreover, there can be no question that municipalities are excluded from participation in the newly enacted managed forest land program. The stated purpose of that plan is "to encourage the management of private forest lands." Sec. 77.80, Stats.
Finally, despite the unfortunate absence of a statutory definition of "owner," other language used throughout chapter 77 strongly suggests that the Legislature did not contemplate general participation by municipalities. For instance, section77.01 sets forth the purposes of the Forest Cropland Law: *Page 285 
 Purposes. It is the intent of this subchapter to encourage a policy of protecting from destructive or premature cutting the forest growth in this state, and of reproducing and growing for the future adequate crops through sound forestry practices of forest products on lands not more useful for other purposes, so that such lands shall continue to furnish recurring forest crops for commercial use with public hunting and fishing as extra public benefits, all in a manner which shall not hamper the towns in which such lands lie from receiving their just tax revenue from such lands.
See also sec. 77.80, Stats. The term "commercial use" does not suggest participation by governmental entities. Moreover, the final clause relating to towns receiving their just revenues would prove cumbersome, if not impossible, to administer if a town entered or continued land in a forestation program.
A forestry program which is based in part upon providing the participating property owner with more favorable real property tax treatment than that ordinarily available under the provisions of chapter 70, may not appear attractive to a private non-profit organization in reference to any of its property which is otherwise tax exempt under that chapter. However, certain of the property of such an entity may be taxed under the provisions of chapter 70, since exemption may depend not only upon the nature of the organization involved but also upon the manner in which a property is used. The motivations of a private non-profit organization in reference to the taxation of such property would not differ appreciably from those of any other property owner. Moreover, if the purchaser of a parcel of property which is under a forest tax program does not continue under the program, for whatever reason, the purchaser must pay the withdrawal penalties, regardless of whether it has a tax-exempt status under chapter 70. See secs. 77.04, 77.10, 77.11, 77.16(7) and 77.88(5), Stats. Therefore, a private tax-exempt entity purchasing a parcel of property which is under a forest tax program might well be desirous of continuing the property under such program, and also be just as interested as a taxable entity in avoiding the payment of taxes which would be due upon withdrawal from the program.
Private non-profit entities are not precluded from purchasing lands which are under forest tax programs and are not precluded from agreeing to assume the obligations of the former owner under *Page 286 
such programs so as to forestall withdrawal and the payment of the attendant tax payments. Unlike the governmental entities discussed earlier in this opinion, there is no legislative history or other legal principle which prevents a private non-profit entity from being an "owner" eligible to participate in such a program. Moreover, "[a] cardinal rule in interpreting statutes is to favor a construction that will fulfill the purpose of the statute over a construction that defeats the manifest object of the act." Watkins v. LIRC, 117 Wis.2d 753, 761,345 N.W.2d 482 (1984). An interpretation of the forestry tax statutes which encourages private non-profit entities to enter or continue their lands under the terms of the forestry programs established by the Legislature, while at the same time ensuring some measure of financial assistance to local governments, comports with the original purposes of the Legislature in enacting such statutes.
DJH:JCM
[1] "County Forests in Transition," Report of the Forest Crop Advisory Committee to Governor Gaylord Nelson (Madison, WI 1962) pages 1-6. Also see generally E.D. Solberg, New Laws for NewForests: Wisconsin's Forest Fire, Tax, Zoning, and County-ForestLaws in Operation (UW Press 1961).
[2] P.S. Lovejoy, "Wisconsin's Idle Acres Should Be Put toWork," pages 8-9 in Put Idle Acres to Work (March 1921) (published by the Milwaukee Journal).
[3] "County Forests in Transition" at page 1 and 66 Op. Att'y Gen. 78, 81 (1977).
[4] "Owner" or "ownership" means one with an interest in the land in fee or in equity, including that of a grantee of a land contract prior to satisfaction of all conditions of the contract, or as established by statute. *Page 287